108 N.J. Super. 331 (1970)
261 A.2d 380
AMERCOAT CORPORATION, PLAINTIFF,
v.
REAGENT CHEMICAL & RESEARCH, INC., DEFENDANT AND THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
KANSAS CITY SOUTHERN RAILWAY COMPANY AND ATCHISON, TOPEKA AND SANTE FE RAILWAY COMPANY, THIRD-PARTY DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1969.
Decided January 29, 1970.
*334 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Benjamin P. Michel argued the cause for appellant Kansas City Southern Railway Company (Messrs. Riker, Danzig, Scherer & Brown, attorneys).
Mr. Frederick F.R. Gruen argued the cause for appellant Atchison, Topeka and Santa Fe Railway Company (Messrs. Lum, Biunno & Tompkins, attorneys).
Mr. David I. Fox argued the cause for respondent (Messrs. Fox. Yanoff and Fox, attorneys).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
Third-party defendants Kansas City Southern Railway Company (Kansas City) and Atchison, Topeka and Santa Fe Railway Company (Santa Fe) have, pursuant to leave granted, each appealed from a denial of their motions to dismiss a third-party complaint brought by defendant Reagent Chemical & Research, Inc. (Reagent), or to quash service of process. The appeals were consolidated.
Plaintiff Amercoat Corporation (Amercoat), a California corporation registered to do business in New Jersey, is a manufacturer of chemical storage tanks. Defendant Reagent, a New Jersey corporation having its principal place of *335 business at Middlesex, N.J., stores and sells chemicals. Amercoat instituted an action against Reagent in the Law Division on a book account to recover $6,418.90, the purchase price of two chemical storage tanks sold and delivered. The sales contract called for delivery of the tanks from Amercoat's plant in Ardmore, Oklahoma, to Reagent's operation at Port Arthur, Texas.
Reagent's answer denied the debt and asserted a breach of contract in that the tanks were damaged and unfit for use when delivered. By way of counterclaim Reagent claimed damages directly resulting from plaintiff's breach because it had been obliged to purchase replacement tanks at higher prices and to transport chemicals from a distance at great expense during the period when no tanks were available to replace those plaintiff had agreed to sell and deliver.
Reagent also filed a third-party complaint in two counts against Kansas City and Santa Fe, over whose lines the tanks had been shipped by Amercoat, the theory being that if delivery to Reagent was completed upon Amercoat's depositing the tanks with the railroad at Ardmore, Oklahoma, one or both carriers would be liable to Reagent for the losses incurred through their breach of the carriage contract and for negligence. The first count demanded judgment for all sums that might be adjudged against Reagent in favor of Amercoat; the second count sought recovery from the third-party defendants should it be determined that Amercoat was not liable for damages under Reagent's counterclaim.
Kansas City is a Missouri corporation having its principal place of business in Kansas City, Mo., and operates directly in Missouri, Kansas, Arkansas, Louisiana, Oklahoma and Texas. Santa Fe is a Kansas corporation having its principal place of business in Chicago, Ill., and operates directly in Illinois, Missouri, Kansas, Oklahoma, Louisiana, California, New Mexico and Kentucky. Defendant Reagent attempted service of process on the carriers in two ways: (1) by serving the registered agent of Penn-Central Company in New Jersey as agent for the third-party defendants, *336 and (2) by sending copies of the summons and third-party complaint by registered mail to Kansas City at its Missouri office and to Santa Fe at Ardmore, Okla.  this pursuant to R.R. 4:4-4(d), now R. 4:4-4(c)(1).
Kansas City and Santa Fe successfully challenged the attempted service on Penn-Central Company, defendant Reagent conceding that there was no basis for such service. However, they were unsuccessful in quashing the substituted service of process made under the cited rule. They had moved to dismiss the third-party complaint or to quash the service for the reason that they lacked sufficient "minimum contacts" with New Jersey and for the further reason that the doctrine of forum non conveniens militated against Reagent maintaining its suit in New Jersey.
On this appeal the third-party defendants claim error in that (1) the assertion of jurisdiction over them would violate due process of law and constitute an unreasonable burden on interstate commerce, and (2) regardless of the resolution of the jurisdictional issue, the third-party suit should have been dismissed on the basis of forum non conveniens.

I
R.R. 4:4-4(d), now part of R. 4:4-4(c) (1), authorized substituted service of process on a foreign corporation, where service could not be made upon it in any of the other ways listed in that section of the rule, "subject to due process of law, by mailing, registered mail return receipt requested, a copy of the summons and complaint to a registered agent for service, or to its principal place of business, or to its registered office." The clear purpose of the rule is "to vest our courts with jurisdiction over foreign corporations to the outer limits permitted by due process." Corporate Development Specialists, Inc. v. Warren-Teed Pharmaceuticals, Inc., 102 N.J. Super. 143, 148 (App. Div. 1968). By affidavit both Kansas City and Santa Fe contended that they are not New Jersey corporations, maintain *337 no office and employ no personnel in New Jersey, own no property here and do no business in this State. They concede, however, that they have representatives in their respective New York City offices, who regularly call upon shippers in New Jersey to point out the advantages of routing their shipments, where practical, over their lines, and to acquaint shippers with the facilities and equipment available to them. They claim that their only connection with New Jersey is their bailment of cars to local railroads. This is explained as follows: When Kansas City or Santa Fe, or any other out-of-state connecting carrier, accepts a freight load which is ultimately to be routed into New Jersey for delivery there, the out-of-state connecting carrier charges the shipper the full price of the start-to-finish haul, carries the load over its tracks, delivers it to the railroad with tracks in New Jersey at a point where the local railroad's tracks meet those of the out-of-state railroad, and pays the local railroad on a pro rata basis for that fraction of the total mileage which its hauling constitutes. Thus, if a Kansas City or Santa Fe freight car traverses the New Jersey tracks of the Penn-Central Railroad, for example, then Penn-Central would be paid a rental fee in accordance with the industry-wide custom and practice laid down by the Association of American Railroads.
In support of their argument, the third-party defendants refer to federal holdings to the effect that "mere solicitation" in a state by a nonresident corporation is an insufficient relationship to support the exercise of extraterritorial jurisdiction over that company, e.g., Green v. Chicago, Burlington & Quincy Ry., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916 (1907); Michigan Central R. Co. v. Mix, 278 U.S. 492, 49 S.Ct. 207, 73 L.Ed. 470 (1929). They also cite later cases which entrenched and extrapolated the Green holding into the so-called "solicitation plus" doctrine, which basically establishes that something more is required than just solicitation by a nonresident corporation, e.g., Philadelphia & Reading Ry. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, *338 61 L.Ed. 710 (1917); Fannin v. Chesapeake & Ohio Ry. Co., 204 F. Supp. 154 (D.W.D. Pa. 1962). However, just what may constitute the "plus" is not defined, but is resolved on the facts of the particular case. Moreover, the carriers urge that Reagent's claim is unrelated to their "tenuous" business relationship with New Jersey, and therefore a "greater magnitude and/or continuity" of "contacts" with the state is required for the reasonable and fair exercise of jurisdiction than if the claim grew directly out of "doing business" here, citing the Corporate Development Specialists case, above. But the court there went on to say:
"* * * However, the concept of substantiality is clearly not an absolute, but rather a relative one. The notion is one of sufficient substantiality (given continuity) of the forum business to make it reasonable to exert jurisdiction as against the countering influence of non-relation of the cause of action. This, however, must be measured in the light of the attendant circumstances and any other factors exerting an influence toward justification for assertion of jurisdiction. * * * [102 N.J. Super., at 152]
It must be recognized that the "mere solicitation" test (or "solicitation plus" doctrine), as articulated by succeeding courts, relies basically on the Green and McKibbin holdings. Their present applicability depends on the current viability of the underlying holdings. Decided during the infancy of extraterritorial jurisdiction, those cases, like others, proceeded essentially on an out-dated view of the requisites for jurisdiction. Early in the century jurisdiction was thought to be based on "power" as strictly delimited by state boundaries. Accordingly, a state was without jurisdiction to hail a nonresident corporation into the local courts unless that state was physically able to exert its sovereign power over it. The concept of power revolved closely around the concurrent concept of "physical presence" within the jurisdiction. Since the corporation had no real physical presence, as such, the fiction arose that this artificial person was "present" in the state of its incorporation or wherever it was "doing business." The earlier courts, chary to expose *339 foreign corporations to distant suits, carefully scrutinized the quantum of activities within a given state to determine the degree to which the firm was "doing business." The "solicitation plus" doctrine was one outgrowth of this case-by-case examination. Thus, both Green and McKibbin rely on the fundamental underpinnings of "power" as defined by strictly territorial concepts in determining proper jurisdiction and the limits of due process.
International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945), signaled a profound re-thinking of the mechanical evaluation principles of the past. Rejecting the quantum of activities test of earlier case law, the court held that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice'" (at 316). The court noted that the sales activities of defendant were "systematic and continuous" and indirectly generated a significant volume of business, and that, in conducting its intrastate affairs, it received the benefits and protection of the local laws. Accordingly, it held that defendant had established such "minimum contacts" as to validate the exercise of personal jurisdiction.
The essential question posed here is whether the holding of International Shoe has undercut the importance of the earlier, and more rigid, jurisdictional tests, particularly the "solicitation plus" doctrine. Prior to the International Shoe holding, increasing judicial dissatisfaction with the inflexibility of the mechanical rules caused a perceptible trend of lessening of the requirements as to what constituted "solicitation plus." Frene v. Louisville Cement Co., 77 U.S. App. D.C. 129, 134 F.2d 511, 146 A.L.R. 926 (1943) ("Although the rule has not been clearly and expressly repudiated by the Supreme Court, its integrity has been *340 much impaired by the decisions which sustain jurisdiction when very little more than `mere solicitation' is done" (at 517)). However, even after International Shoe the status of the earlier doctrines was unclear. The confusion stemmed from the fact that the Supreme Court did not expressly overrule the earlier cases but rather superimposed the "minimum contacts" test. Thereafter, succeeding courts have wrestled with the overlap and all but stripped the "solicitation plus" doctrine of meaning by finding sufficient contacts for personal jurisdiction where virtually any form of economic entry into the state was evident. Dodd v. Rahway Valley Co., 150 F. Supp. 599 (D.C.N.J. 1957) (the "plus" was provided by defendant's running of a diner car on New Jersey lines of another railroad in addition to its solicitation in the forum); A. & M. Trading Corp. v. Pennsylvania R.R. Co., 13 N.J. 516 (1953) (jurisdiction found to exist by virtue of foreign steamship line's solicitation in the forum, in addition to its unloading of ships in New Jersey and periodically overhauling them in dockyards here); Ackerley v. Commercial Credit Co., 111 F. Supp. 92 (D.C.N.J. 1953) (the occasional loading and unloading of ships as sufficient "plus"); Lasky v. Norfolk & W. Ry. Co., 157 F.2d 674 (6 Cir.1946) (a soliciting office within the state). Variantly, it has been held that solicitation, in and of itself, may be sufficient "contact" to comport with the requirements of due process. Huck v. Chicago, St. P., M. & O. Ry. Co., 4 Wis.2d 132, 90 N.W.2d 154 (Sup. Ct. 1958); see also, Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (Ct. App. 1915); American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 219 N.W. 28, 60 A.L.R. 986 (Sup. Ct. 1928).
Despite the tangled skein of case law, it seems apparent that the holding of International Shoe was intended to supplant the earlier mechanical rules with a general test of reasonableness. See Hutchison v. Chase & Gilbert, Inc., 45 F.2d 139 (2 Cir.1930) (L. Hand, J.); Dodd v. Rahway Valley Co., above, 150 F. Supp., at 603. Thus, International *341 Shoe's "implicit rejection" of the "physical presence" test and the "solicitation plus" doctrine has downgraded the "doing business" criterion to merely one of a galaxy of relevant factors to be considered in determining the permissibility of the exercise of extraterritorial jurisdiction. The court must not now merely balance the quantum of activities alone but must view the situation and weigh the entirety of the circumstances. See "State Court Jurisdiction," 73 Harv. L. Rev. 909, 923-930 (1960); Farmers' & Merchants' Bank of Cattlesburg, Ky. v. Federal Reserve Bank of Cleveland, Ohio, 286 F. 566 (D.C.E.D. Ky. 1922); Frene v. Louisville Cement Co., above, 134 F.2d, at 516; Dodd v. Rahway Valley Co., above:
* * * while International Shoe recognizes that the facts there show how little more than "mere solicitation" will suffice for valid service, that case does not say that same is the minimal requirement for valid service. Its real holding is, as A & M Trading Corp. construes it to hold, "that the due process requirements of the 14th amendment are satisfied if the suit does not offend `traditional notions of fair play defendant's business, all are, in the aggregate. [102 N.J. Super., at
Accordingly, International Shoe supports the "strongly prevailing view that the earlier rulings of the Supreme Court in the Green and McKibbin cases are no longer a correct statement of the law. [Citations omitted]" Scholnick v. National Airlines, Inc., 219 F.2d 115, 119 (6 Cir.1955). Therefore, the appropriate test in determining whether the New Jersey court's exercise of jurisdiction over the third-party defendants violates due process of law is an overall weighing of the connections of the railroads with this State and of the State's interest in the proceedings.
The carriers contend that their solicitation of business and the bailment arrangement whereby their cars pass over New Jersey lines constitute insufficient "contacts" with New Jersey. However, they admit that significant numbers of their rolling stock may at any given time be carrying freight within the boundaries of the State and that they *342 would receive payments for such use of their cars. They thereby derive direct economic benefit from operations within New Jersey; the rented vehicles form an integral part of the railway system of this State. Cf. Scholnick v. National Airlines, above; Berry v. Pennsylvania R.R. Co., 80 N.J. Super. 321 (Law Div. 1963).
Moreover, Kansas City and Santa Fe derive further benefits from the New Jersey shippers who send shipments via connecting carriers over their out-of-state lines. They actively solicit this business by sending representatives from their New York City offices. It may be admitted that they keep no property in this State and ship no goods into this State, and so the present case may be distinguished from those holding that a single shipment of items into New Jersey may be a sufficient "contact" for the exercise of personal jurisdiction. Cf. Roland v. Modell's Shoppers World of Bergen County, 92 N.J. Super. 1 (App. Div. 1966). However, we are confronted with service, not manufacturing, industries, and their business operations necessarily are of a less tangible variety. Nonetheless, the initiation of advantageous economic relationships by the solicitors of Kansas City and Santa Fe constitutes a significant aspect of "doing business." As the court said in Frene, above: "Solicitation is the foundation of sales * * *. No businessman would regard `selling,' the `taking of orders,' `solicitation' as not `doing business'" (134 F.2d, at 516). It must further be noted that solicitation by the agents of the carriers has been continuous and active, aimed at drumming up business from the substantial industrial concerns of this State.
Perhaps the greatest shift in the analysis of the "doing business" test since International Shoe has been the change in emphasis from the quantum of activities to their continuity. Even prior to the United States Supreme Court's recognition of the significance of continuous business contacts, the federal courts had noted their relative importance:
*343 But when jurisdiction has been extended to include some types or kinds of occasional acts and nearly all kinds of continuous operations, the rule which nullifies judicial power when a foreign corporation engages continuously and regularly in "mere solicitation" is, to say the least, anomalous.

* * * * * * * *
It would seem therefore that the "mere solicitation" rule should be abandoned when the soliciting activity is a regular, continuous, and substantial cause of business, as it is in this case. It constitutes, in the practical sense, both "doing business" and "transacting business," and should do so in a legal sense. [Frene, above, 134 F.2d, at 516]
Both Kansas City and Santa Fe employed full-time agents who "regularly" crossed the border into New Jersey to drum up business. Such "systematic and continuous" soliciting must be viewed as a relevant factor in judging the inherent fairness of the asserted jurisdiction. International Shoe v. State of Washington, above, 326 U.S., at 320, 66 S.Ct., at 154. Nor can it be maintained that the soliciting activity resulted in less than a significant volume of sales. The railroad industry necessarily does business in a multitude of states, all of which are intimately interconnected by the nature of the operations. As the court observed in Corporate Development Specialists, Inc., above:
* * * New Jersey territory can fairly be regarded as an integral segment of a seemingly nationally dispersed sales operation, with the probability that while no single state segment thereof is essential to defendant's business, all are, in the aggregate. [102 N.J. Super., at 152]
Other significant factors, too, must be considered in this constitutional analysis. For one, Kansas City and Santa Fe, with respect to their soliciting and bailment operations, enjoy the protection and benefit of the laws of this State. See International Shoe v. Washington, above, 326 U.S., at 320, 66 S.Ct., at 154. Additionally, New Jersey possesses a direct state interest in providing a court system for its citizens. See International Milling Co. v. Columbia Transp. Co., 292 U.S. 511, 519-520, 54 S.Ct. 797, 78 L.Ed. 1396 (1934). The original two parties to this action regularly do *344 business in this State; moreover, the third-party plaintiff is a New Jersey corporation. To uphold the contentions of the two carriers would be to force the resident corporation to engage in two distinct suits more than a thousand miles apart.
In sum, the combination of (a) the carriers' economic penetration into this State by reason of their program of soliciting business and their freight car rental plan, and (b) the State's interest in providing a forum for its citizens, provides a sufficient basis for finding that the exercise of jurisdiction by our court comports with the requirements of due process and in no way infringes on "traditional notions of fair play and substantial justice." International Shoe v. Washington, above, 326 U.S., at 316, 66 S.Ct., at 154; Corporate Development Specialities, Inc. v. Warren-Teed Pharmaceuticals, Inc., above.

II
Kansas City and Santa Fe further argue that the exercise of jurisdiction in this case casts an unreasonable burden on interstate commerce and therefore cannot stand. Infringement of the federal interest in interstate railroad operations served as a basis for the earlier cases invalidating out-of-state service of process and extraterritorial jurisdiction  this, of course, by reason of the Commerce Clause, U.S. Const., Art. I, § 8. Davis v. Farmers' Co-op. Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996 (1923); Michigan Central Ry. Co. v. Mix, above; Denver & R.G.W.R. Co. v. Terte, 284 U.S. 284, 52 S.Ct. 152, 76 L.Ed. 295 (1932). See also, Glaser v. Pennsylvania R.R. Co., 82 N.J. Super. 16 (Law Div. 1963); but see, St. Louis Southwestern Ry. Co. of Texas v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 57 L.Ed. 486 (1913); Berry v. Pennsylvania R.R. Co., above.
The railroads contend that the bailment procedure evolved in response to the Federal Government's recurrent pleas for *345 the facilitation of smooth interstate freight carriage and to advance the best interests of the American people. Consequently, to subject them to suit here "would be tantamount to penalizing" them for their activities in the furtherance of interstate commerce. Whatever force this argument may have had in the past, its rationale does not stand up under closer scrutiny. Historically, the early cases were decided at a time when railroads were of paramount importance and influence in interstate transportation and communication. Today it is a hard fact of our national economic life that the railroads are in dire and frequently unsuccessful competition with the trucking industry, the airlines, and maritime carriers. The bailment arrangement, while perhaps beneficial to the commercial interests of the nation, is surely of equal benefit to the hard-pressed railroads. The plan enables the lines to provide better long-distance service and encourages the flourishing of many small and previously economically impractical units. As has been historically true of the railroads, the private interest is served at least as greatly as the public weal. Thus, subjecting the lines to multistate jurisdiction is not, in fact, to penalize them for engaging in interstate commerce, but rather an economic "cost" to be borne in return for the many reciprocal gains received.
It should be noted that the "burden on interstate commerce" language has all but disappeared from opinions dealing with jurisdictional issues such as those posed in this case. It could certainly be questioned whether the United States Supreme Court would today reaffirm the early holdings on such a ground. Accordingly, there is no apparent basis for the carriers' claim of an unreasonable impediment to interstate commerce in this case.

III
Since we hold that the substituted service of process upon Kansas City and Santa Fe under the "long arm" provision of R.R. 4:4-4(d) is valid, we turn to their claim that the *346 doctrine of forum non conveniens should be applied and the third-party complaint dismissed.
The doctrine of forum non conveniens is largely equitable in nature and discretionary in application, permitting the court to refuse to entertain an action even though it has jurisdiction. Vargas v. A.H. Bull Steamship Co., 25 N.J. 293, 294 (1957), cert. den. 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958). It "presupposes at least two forums in which defendant is amenable to process." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506-507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); S.D. Sales Corp. v. Doltex Fabrics Corp., 96 N.J. Super. 345, 348 (App. Div. 1967). Since the doctrine is an equitable one, its application is limned by very general standards  e.g., the relative ease of access to proof; availability of compulsory process for witnesses; the cost of obtaining willing witnesses, etc. Whether the doctrine will be invoked depends on the relevant facts and circumstances of each case. Gulf Oil Corp. v. Gilbert, above, 330 U.S., at 508, 67 S.Ct. at 839; Gore v. United States Steel Corp., 15 N.J. 301, 311 (1954), cert. den. 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954). As was said in Starr v. Berry, 25 N.J. 573 (1958)
* * * The present tendency is to avoid a rigid formula and to weigh sundry factors, private and public, which bear upon the justness of a plaintiff's choice. But emphasis continues upon the element of harassment and vexation notwithstanding reference also to the element of trial convenience. [at 584]
And see Wangler v. Harvey, 41 N.J. 277, 286 (1963).
Invocation of the doctrine, however, must not be governed by a simple balancing of conveniences. Starr v. Berry, above, 25 N.J., at 584 and 587; Braucher, "The Inconvenient Federal Forum," 60 Harv. L. Rev. 908, 910 (1947).
Once a court of competent jurisdiction entertains the action, only a strong showing of very great hardship upon defendant will defeat further proceedings in the forum. The chosen forum must be manifestly inappropriate. Plum *347 v. Tampax, Inc., 402 Pa. 616, 168 A.2d 315, cert. den. 368 U.S. 826, 82 S.Ct. 46, 71 L.Ed.2d 30 (1961); and see Starr v. Berry, above, 25 N.J., at 587; Gore v. U.S. Steel Corp., above, 348 U.S., at 311, 75 S.Ct. at 84; Gulf Oil Co. v. Gilbert, above, 330 U.S., at 508, 67 S.Ct., at 839. Moreover, while the plaintiff's residence within the forum is not dispositive of the applicability of the doctrine, it is of "high significance" in weighing the relevant considerations. Koster v. (American) Lumbermen's Mutual Cas. Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Finally, a mere showing of inconvenience on the part of a defendant is not enough; it must also be established that dismissal or transfer of the action will cause no serious inconvenience to the plaintiff. Starr v. Berry, above, 25 N.J., at 587.
Accordingly, while the doctrine leaves much to the discretion of the court to which a plaintiff resorts, it is only the rare case where the combination and weight of the applicable factors are sufficient to justify its application. The test, as was said in Starr v. Berry, should be an exacting one, "practicable as well as inherently just. The doctrine was originated to prevent harassment of a defendant; it should not now be used offensively to embarrass or destroy a claimant's opportunity to be heard." [at 587].
In New Jersey the doctrine of forum non conveniens has primarily been applied in actions based on out-of-state, nonstatutory torts involving personal injuries, where defendant is not a New Jersey resident and the bulk of the witnesses are also nonresidents. See Gore v. U.S. Steel Corp., above; Vargas v. A.H. Bull Steamship Co., 25 N.J. 293 (1957), cert. den. 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed. 534 (1958). Actions based on contract, on the other hand, appear to be allowed to proceed to trial in the chosen forum, except in the most exceptional of circumstances, even where the relationship of the action and of the parties to the State is tenuous. Cf. James H. Rhodes & Co. v. Chausovsky, 137 N.J.L. 459, 461 (Sup. Ct. 1948); Quigley Co., Inc. v. Asbestos Limited, Inc., 134 N.J. Eq. 312, 313 (Ch. 1944).
*348 The present action was instituted by Amercoat, a foreign corporation, authorized to do and doing business in New Jersey, against Reagent, a resident corporation. Reagent filed a third-party complaint against Kansas City and Santa Fe. Thus, for the purposes of this appeal, the "plaintiff" may be considered to be a resident of this State, and so the burden on the third-party defendants to show adequate cause for applying the doctrine is almost insuperable.
The carriers contend that most of the witnesses to be called would be from distant regions. However, in their affidavits they fail to specify the number of persons involved, or any difficulty in producing them, but rely on nothing more than a blanket statement. Moreover, plaintiff points out that the witnesses to be summoned by the original parties are readily available within this forum.
The railroads rely on the holding in B. Heller & Co. v. Perry, 201 F.2d 525 (7 Cir.1953), where the doctrine of forum non conveniens was applied to an action involving a railroad accident in a sister state. However, it should be noted that the matter was before a federal court, which could order a transfer of the action. Here the court's only recourse would be a dismissal of the third-party complaint. The strongest factor militating against the application of the doctrine in this case is the fact that to adopt the argument advanced by the carriers would split the cause of action, for the original action would be unaffected. Defendant Reagent would be forced to maintain two separate causes of action more than a thousand miles apart.
The threat of foreign suits is but one of the costs of railroads doing business in many states. Kansas City and Santa Fe have long participated in sending their cars into or through New Jersey under the protection of our laws. They cannot now be heard to disclaim the right of a New Jersey court to pass on their possible liability. McGee v. International Life Ins. Co., 355 U.S. 220, 222-223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ("modern transportation *349 and communications have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity"). More importantly, any splitting of the present action would in our view cast a greater burden on third-party plaintiff Reagent than on the carriers.
Forum non conveniens being essentially an equitable doctrine to be applied in the discretion of the trial judge, we will not substitute our judgment for his since we find no showing of clear abuse of that discretion.
Like the argument addressed to due process and the Commerce Clause, we find the claim based on forum non conveniens without merit.
Affirmed.